## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ADAM KAYCE**, *on behalf of himself and all others similarly situated*;<br><br>        Plaintiff,<br><br>    v.<br><br>**PATRIOT NATIONAL, INC**. and **STEVEN MARIANO**;<br><br>        Defendants. | **Civil Action No.**<br><br><br><br>**Jury Demanded** |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE FEDERAL SECURITIES LAWS

Plaintiff, Adam Kayce ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Patriot National, Inc., ("Patriot National" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Patriot National; and (c) review of other publicly available information concerning Patriot National, including court filings.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that acquired Patriot National's common stock between March 3, 2016 and November 14, 2016, inclusive (the "Class Period"), against Patriot National and Steven M. Mariano ("Mariano", together, "Defendants"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") for securities fraud and stock manipulation.

2.      Patriot National is a Fort Lauderdale based insurance service holding company.  It was incorporated in 2013, to consolidate a group of insurance services companies controlled by Mariano, who is the Company's controlling shareholder, with approximately 54% of its outstanding shares.

3.      The Company provides two types of services: front-end services, such as brokerage, underwriting and policyholder services, and back-end services, such as claims adjudication and administration.  The Company's products and services help insurance carriers, employers and other clients mitigate risk, comply with complex regulations, and save time and money.

4.      The Company's primary client is and has been Guarantee Insurance Company ("Guarantee"), a company that is 100% owned by Mariano.

5.      Since its inception, the Company has been run for Mariano's benefit, and has repeatedly disseminated materially false and misleading statements, and/or engaged in market manipulation in order to benefit Mariano.

6.       This action ("Action") arises out of the Defendants' materially false and misleading statements regarding, and their manipulation of the market for the Company's stock price by way of a stock repurchase program announced on March 3, 2016 (the "Stock Repurchase Program") which was intended to and did artificially drive up the price of the Company's stock.

7.      Prior to the Stock Repurchase Program, the Company had approximately 11,000,000 shares outstanding on a fully diluted basis, excluding the 60% of the shares held by insiders.  From the period commencing March 3, 2016 for the next several months, the Company repurchased over 1,360,000 shares or over 10% of the Company's outstanding shares thereby driving up the price of the Company's thinly traded stock.

8.      The true purpose of the Stock Repurchase Program was to manipulate and artificially increase the price of the Company's stock, in order to decrease the number of shares that Mariano would be required to deliver to private equity investors in the Company, Hudson Bay Master Fund Ltd. ("Hudson Bay"), CVI Investments Inc. ("CVI"), and Alto Opportunity Master Fund, SPC ("Alto" together with Hudson Bay and CVI, the "Private Equity Investors") pursuant to a revised securities purchase agreement (the 2015 Rescission and Exchange Agreement, "Rescission Agreement") and to enable Mariano to maintain his position as controlling shareholder and thus to entrench himself while cashing out some of these shares.   Mariano and the Company are currently being sued by both Hudson Bay and CVI for breach of contract, among other claims.

9.      As discussed more fully below, the Company released earnings per share results for the First and Second Quarters of 2016 which were artificially manipulated by the repurchases during these periods under the Stock Repurchase Program.

10.     However, the Company made no repurchases during the Third Quarter of 2016 and therefore on November 14, 2016, the Company announced negative third quarter earnings which were not affected and not manipulated by additional stock repurchases in that quarter.

11.     In addition to manipulating the price of the Company's stock during the Class period, Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business and its financial situation further resulting in the artificial inflation of its stock price.

12.     Specifically, Defendants made affirmative misstatements concerning the purpose and need for the Stock Repurchase Program and falsely represented that its purpose was to increase the Company's stock price because the Company's stock price did not accurately reflect the Company's value, when, as described above, the true purpose of the Stock Repurchase Program

3

was to artificially inflate the market price of the Company's stock to enable Mariano to provide fewer shares to private equity investors and to maintain his control position.

13.     On November 14, 2016, the Company also announced that it was expanding the Stock Repurchase Program from $15 million to $40 million.

14.     With this (2016) change in the Stock Repurchase Program, the Company characterized the increase (along with a special dividend) as a reward to shareholders for their patience.

15.     The Company had already, via the Stock Repurchase Program, driven the stock price up from $3.65 on March 2, 2016 to a high of $9.73 on August 11, 2016.  The absurdity of the March 3, 2016 explanation was now made obvious to investors.

16.     Instead, investors now saw the exposed truth – the Stock Repurchase Program was not about the Company's concern that the stock was significantly undervalued.

17.     Upon these revelations, the Patriot National stock price dropped nearly 10% on very high volume and continued to trade on very high volume for two more days, closing on November 16 over 12% lower than the stock price prior to the announcement.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities once the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

19.     Defendants' conduct does not fall within the safe harbor provisions contained in Section 10b-18, as Defendants' actions, including the Stock Repurchase Program, were made as part of a manipulative scheme, to mask Mariano's personal motive to reduce the number of shares for which he was responsible under the Rescission Agreement.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information and the manipulation of the Company's stock, occurred in substantial part in this Judicial District.  In addition, the Company's shares are actively traded in this Judicial District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

18.     Plaintiff, Adam Kayce, as set forth in the accompanying certification, incorporated by reference herein, purchased Patriot National common stock during the Class Period, and suffered damages as a result of the federal securities law violations including the manipulation of the Company's stock through the Stock Repurchase.

19.     Defendant Patriot National is incorporated in Delaware and its headquarters are in Fort Lauderdale, Florida.  Patriot National's common stock trades on the New York Stock

Exchange ("NYSE") under the symbol "PN."

20.     Defendant Mariano was the Chairman, President, and CEO of Patriot National at all relevant times.  Mariano's resignation was announced on July 13, 2017.

21.     Mariano is the founder and controlling shareholder of the Company holding over 54% of the Company's shares.  At the time of the Rescission Agreement, as further discussed below, Mariano held over 14 million shares of the Company, and insiders held a total of over 65% of the Company.

22.     However, over 11,800,000 of Mariano's shares were encumbered and pledged to other creditors of the Company, including UBS Bank USA and Fifth Third Bank, leaving Mariano with an insufficient number of unencumbered shares to satisfy his requirements under the Revised SPA, as further discussed below.

23.     Mariano, because of his position with the Company and his controlling shareholdings, possessed the power and authority to control the contents of Patriot National's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market, and to cause the Company to engage in a manipulative stock repurchase.

24.     He was provided with copies of the Company's public statements, and material pertinent to the Stock Repurchase that are alleged herein to be misleading or manipulative, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information available to him, Mariano knew that the adverse facts specified herein had not been disclosed to the public, and that the Stock Repurchase Program was manipulative, but concealed that information from the public, and made affirmative misrepresentations about the Stock Repurchase Program, and the Company's finances.

## SUBSTANTIVE ALLEGATIONS

### Background

### The Company's Stock Price Declines Dramatically Upon Disclosures of the Initial Terms of the PIPE

25.    Since the Company's IPO in 2015, Mariano, as its controlling shareholder, has used it has his personal piggybank to finance self-dealing transactions and earn tens of millions of dollars.

26.    In late December 2015, faced with a restrictive loan facility, Mariano caused the Company to engage in a likely unnecessary private investment in a public entity or PIPE, with the Private Equity Investors in order to enable him to cash out some of his shares, while maintaining his control position.

27.    The initial securities purchase agreement, which was entered into on December 13, 2015, provided for the issuance of: "(i) an aggregate of 666,666 shares of common stock, (ii) the Old Series A Warrants to purchase up to an aggregate of 2,083,333 shares of common stock and (iii) the prepaid Old Series B Warrants for 1,000,000 shares of common stock to CVI Investments, Inc., Hudson Bay Master Fund Ltd., and Alto Opportunity Master Fund, SPC … for an aggregate purchase price of approximately $20 million." ("Securities Purchase Agreement"). To offset the risk that the price of the Company's shares would decline, the warrants entitled the Private Equity Investors to additional shares of the Company based upon a formula tied to the Company's stock price, providing them with more shares if the Company's stock price declined.  The agreement, however, prevented the Private Equity Investors from obtaining more than 4.99% of the Company's shares.

28.    Pursuant to a concurrent back-to-back agreement (the "Back-to-Back Agreement"), the majority of the shares to be provided to the Private Equity Investors upon the exercise of the

warrants were to be delivered by Mariano to the Company, which in turn was to deliver newly issued shares to the Private Equity Investors. Specifically, the Company would purchase the number of shares of Company stock owned by Mariano equal to 60% of the shares to be issued in connection with the exercise of the warrants by the Private Equity Investors. The agreement contained a commitment that an adequate number of shares would be available to the Private Equity Investors, upon the exercise of the warrants and pursuant to the Back to Back Agreement.

29.     Upon public disclosure of the original (2015) Securities Purchase Agreement, the price of the Company's shares plummeted.

**The Revised Securities Purchase Agreement**

30.     With the price of the Company's stock plummeting, Mariano was forced to take action to raise the stock price, or else be liable to deliver shares he did not own. He renegotiated the Securities Purchase Agreement and entered into a Rescission and Exchange Agreement, pursuant to which the Private Equity Investors agreed to return some of the shares they had purchased to Patriot National and in exchange for new warrants and cash.

31.     Accordingly, on December 23, 2015, Defendants and the Private Equity Investors entered into the Rescission Agreement, which, among other things, amended certain provisions of the Securities Purchase Agreement and exchanged the original warrants for the new warrants ("New Warrants"). In particular, "[o]n December 23, 2015, the Company and the [Private Equity] Investors rescinded the sale and purchase of 666,666 shares of common stock and exchanged the Old Series A Warrants for the New Series A Warrants to purchase up to an aggregate of 3,250,000 shares of our common stock, and the Old Series B Warrants for the prepaid New Series B Warrants to purchase shares of our common stock, subject to adjustments pursuant to their terms. The New Series A Warrants are exercisable at an exercise price of the lesser of (i) $10.00 and (ii) 85% of

the market price of the shares (as defined in the New Warrants), from July 1, 2016 to December 31, 2020. The New Series B Warrants are exercisable at an exercise price of $0.01 from December 16, 2015 to December 31, 2020…."

32.     Under the terms of the Rescission Agreement, Patriot National returned $20 million to the Private Equity Investors (through the return of the 250,000 Shares that each had purchased from Patriot National and the elimination of rights to shares through the base share component of the Original Series B Warrant).  Defendant Mariano, however, kept the $30 million he had received.

33.     The old series warrants were exchanged for new warrants to purchase up to an aggregate of 3,250,000 shares of the Company's common stock (the "New Series A Warrants").

34.     The old Series B Warrants were exchanged for new prepaid warrants to purchase a number of shares that the holder could purchase at a price equal to the lowest 10-day volume weighted moving average stock price during the period commencing on February 1, 2016 through and including April 4, 2016, less the number of shares the investor received under the warrant (the "New Series B Warrants").

35.     Like the original series B warrant, the New Series B Warrant was "pre-funded," in that Private Equity Investors had already paid for the shares that were deliverable upon exercise of the New Series B Warrant, except for the nominal penny-per-Share exercise price.

36.     However, there was critical difference in how the warrants operated: Mariano was required to hold *one hundred* (100) percent of the Shares deliverable pursuant to the New Warrants, as compared to sixty (60) percent of the Shares deliverable pursuant to the Original Warrants, that amount of which was dependent upon the Company' share price, as before.

37.     Accordingly, upon the execution of the Rescission Agreement, Mariano and Patriot National entered into the Amended Back-to-Back Agreement (the "Amended Back-to-Back Agreement"), under which Mariano agreed to sell to Patriot National, and Patriot National agreed to purchase from Mariano, one hundred (100) percent of the amount of Shares deliverable to holders of the New Warrants upon the exercise thereof.

38.     Under the Amended Back-to-Back Agreement, Mariano represented and warranted that he "at all times shall (a) own sufficient shares of Common Stock to satisfy his obligations under Section 1.1 . . . , (b) not sell or transfer (contingently or otherwise) any shares of Common Stock that will leave him with ownership of less than such number of shares of Common Stock, and (c) not place or permit to exist any liens, charges or encumbrances."   (Back-to-Back Agreement § 4.1.)

**Mariano Cannot Satisfy the Agreement if the Company's Stock Price Drops**

39.     The New Series A Warrant permitted the Private Equity Investors to purchase Common Stock from Patriot National—at any time on or after July 1, 2016—by delivering an "Exercise Notice" in the form prescribed by the New Series A Warrant.  Hudson Bay, for example, could purchase 1,462,500 of Patriot Common Stock (subject to adjustment under certain conditions) at the lesser of (i) a fixed price of $10 per share, or (ii) the Variable Exercise Price, which is calculated as 85% of the Market Price of Patriot shares as of the exercise date (as the term "Market Price" is defined in the New Series A Warrant).

40.     The New Series B Warrant permitted the Private Equity Investors to purchase Shares from Patriot National at a "nominal exercise price of $0.01 . . . per Warrant Share" by delivering an "Exercise Notice" in the form prescribed by the New Series B Warrant.

41.     The number of Shares that Private Equity Investors were entitled to purchase under the New Series B Warrant is determined by a formula principally set out in Section 2(b) of the Warrant.  That Section provided that the number of Shares that "may be purchased upon exercise of this [New Series B Warrant] shall equal . . . the Adjustment Share Amount."  The Adjustment Share Amount was dependent on the stock price during the measuring period, and was calculated as a number that equals the difference between (i) the quotient of the price paid for Mariano's Shares under the Securities Purchase Agreement ($13,500,000) divided by 90% of the lowest 10-day volume-weighted average stock price between February 1, 2016 and April 4, 2016—and (ii) the number of Shares that each Private Equity Investor purchased under the Securities Purchase Agreement from Defendant Mariano (1,125,000 Shares).

42.     If the price of publicly traded shares of Patriot National fell below the price that, and Hudson Bay, for example, paid for the shares under the Securities Purchase Agreement ($12 per share), then the number of shares deliverable pursuant to the New Series B Warrant would increase.  The additional shares that Hudson Bay would receive pursuant to the New Series B Warrant effectively served to reduce the price per share that Hudson Bay paid.  So, although Hudson Bay, for example, received 1,125,000 shares in exchange for $13.5 million under the Securities Purchase Agreement, it would receive additional shares under the New Series B Warrant for almost no additional consideration.

43.     Pursuant to Section 1(a) of both Warrants, Patriot National was required to deliver the shares called for by an Exercise Notice within three (3) trading days of receipt of such a Notice.

44.     Under Section 1(g)(i) of both Warrants, Patriot National must, "at all times[,] keep reserved for issuance under [the Warrants] a number of shares of Common Stock at least equal to

the maximum number of shares of Common Stock as shall be necessary to satisfy the Company's obligation to deliver shares of Common Stock under the [Warrants] then outstanding …."

45.     In addition, under Section 1(g)(ii) of both Warrants, in the event that Patriot National did not have a sufficient number of authorized Shares to satisfy its obligations, Patriot National must "immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for all the [Warrants] then outstanding."

**Mariano Takes Steps to Keep the Stock Price from Dropping**

46.     On February 24, 2016, the price of the Company's stock closed at $6.11 per share. After the close of trading, Patriot National released its 2015-year end earnings on Form 8-K, causing a negative reaction. The following day, Patriot National's stock closed at $4.54 per share, and continued to drop each day from $4.37 per share, to $4.22 per share, to $3.92 per share.  On March 2, 2016, it closed at $3.65 per share—well below the $5.99 per share price that Mariano had expected would be used to determine the number of shares which he negotiated the Securities Purchase Agreement and the Back-to-Back Agreements.

47.     The continued dropping of the stock price meant that the amount of shares that Mariano would have to provide to Patriot National under the Back-to-Back Agreements would increase especially under the New B Warrants, and possibly under the New A Warrants, under the measuring formula which was tied to the Company's stock price, and his percentage ownership in the Company would be diluted.

48.     Significantly, it meant that Mariano would have to supply unencumbered shares that he did not own, in breach of the Securities Purchase Agreement, the Rescission Agreement, and Back to Back Agreements.

49.     In its Form 10-K filing with the Securities and Exchange Commission on March 21, 2016, Patriot National stated that "[b]ased on the lowest 10-day volume-weighted average stock price during the period commencing on February 1, 2016 through March 17, 2016 of $4.51, we estimate that 4,895,985 shares of our common stock would be issuable upon exercise of the New Series B Warrants."

**Mariano Announces the Stock Repurchase and Patriot National Starts Buying Back Stock**

50.     To conceal the fact that he did not have a sufficient number of unencumbered shares under the Back-to-Back Agreements to provide to Patriot National, on March 3, 2016, Mariano used his control to cause the Board to adopt a $15 million stock repurchase program, allowing the Company to repurchase up to $15 million in common stock and causing the Company to amend its existing credit agreement so it could finance the repurchase.

51.     Accordingly, on March 3, 2016, Mariano caused the Company to announce that it was commencing a stock repurchase program, which it then commenced the next day. The release, filed on a Form 8-K, with the SEC on March 7, 2016, stated that the Board had "approved a $15 million repurchase program", that might continue for up to eighteen (18) months.".

52.     In announcing the new Stock Repurchase Program, Mariano and the Company falsely stated in the Company's March 3 2016 press release that the program was being instituted because the Company believed that "the Company's common stock is significantly undervalued and does not reflect the value or the earning power of our operating platform . . ."

53.     The Company's press release further disclosed that the Stock Repurchase Program was "effective immediately", and that it "gives management discretion in determining the market and business conditions under which shares may be purchased from time to time, in open market transaction or in negotiated off-market transactions."

54. The true purpose for the Stock Repurchase Program, however, was to artificially drive up the price of the Company's stock so that both Patriot National and Mariano would have to supply fewer shares to the Private Equity Investors, under the terms of the New B Warrant. Because Mariano did not have a sufficient number of unencumbered shares to satisfy the terms of the Warrant, however, the Company continued to buy back sufficient stock so that Mariano could avoid having to provide shares he did not have.

55. The announcement and immediate commencement of the Stock Repurchase Program coincided with the measuring period for determining the number of shares to be issued to the Private Equity Investors pursuant to the New B Warrants.

**The Company Immediately Purchases Over $8.7 Million in Shares**

56. As intended, almost immediately upon the announcement of the Stock Repurchase Program and within the measuring period for the New Class B Warrants, the Company purchased 992,182 shares of stock for a total purchase price of $8.7 million, or close to 10% of the outstanding shares not held by insiders. (The Company was precluded from purchasing more than 1,000,000 shares per month under its credit agreement with BMO (the "BMO Credit Facility").

57. Consequently, from March 4, 2016 to March 8, 2016, the Company repurchased 259,034 shares at prices ranging from $4.28 to $5.51 per shares, and through March 14, 2016, it purchased at total of 992,182 outstanding shares. It continued purchasing shares the next quarter as well.

58. The Company disclosed in its Form 10-Q for the quarter ended March 31, 2016 (the "First Quarter 10-Q" filed with the SEC on May 13, 2016) that Patriot National had repurchased 992,182 total shares under the Stock Repurchase Program as of March 31, 2016.

59.     Earnings per share is based upon a weighted average number of shares for the Company for each quarter.  The weighted average number of shares for the 2016 First Quarter was decreased as a result of the repurchased shares.  That in turn artificially pushed up the earnings per share for the quarter.  Patriot National's announced earnings per share for the 2016 First Quarter of $.12 was therefore affected and manipulated by the stock repurchases in that quarter and by the Defendants' manipulative device.

60.     The Company disclosed in its Form 10-Q for the quarter ended June 30, 2016 (the "Second Quarter 10-Q" filed with the SEC on August 15, 2016) that Patriot National had repurchased 1,360,457 total shares under the Stock Repurchase Program as of June 30, 2016.

61.     The weighted average number of shares for the 2016 Second Quarter was decreased as a result of the repurchased shares.  That in turn artificially pushed up the earnings per share for the quarter.  Patriot National's announced earnings per share for the 2016 Second Quarter of $.45 was therefore affected and manipulated by the stock repurchases in that quarter and by the Defendants' manipulative device.

62.     These purchases also caused the price of the stock to artificially climb as intended. Commencing on March 3, 2016, with volume of over 1,000,000 shares, the Company's stock price started to climb from $3.65 share to over $4.00 per share and would continue to climb through the Class Period on heavy volume to over $9.62 per share.

63.     On January 15, 2016, the Company filed a registration statement on Form S-1 (the "Registration Statement") with the SEC which was declared effective on February 8, 2016.  The Registration Statement registered for sale the Private Equity Investors shares of stock pursuant to the 2015 Securities Purchase Agreement and Rescission Agreement.

64.    In that Prospectus, the Company sought to register up to 2,500,000 shares of common stock, and 7,848,794 shares of common stock issuable upon the exercise of warrants, based upon a trading price of $5.99 per share, a price far higher than the price of the stock during the measuring period for the Class B Warrants.

65.    The Prospectus further indicated that the issuance of those shares would result in the decrease in Mariano's holdings from over 50% of the Company's shares to about 28%, giving him every reason to try to artificially inflate the price of the stock during the measuring period.

**The Private Equity Investors Demand Their Shares But Mariano Does Not Have Them**

66.    On March 28, 2016, Hudson Bay sent an email to Patriot National asking Patriot National to confirm Hudson Bay's calculations of the number of shares that Hudson Bay was entitled to purchase pursuant to the New Series B Warrant. In the email, Hudson Bay calculated that it was eligible to receive up to 2,203,511 Shares pursuant to the New Series B Warrant (without regard to the Blocker Provision which prevented any shareholder from obtaining more than 4.99% of the outstanding shares), and specifically that "[w]e compute that we'd be able to exercise to receive up to 2,069,457 registered shares for a Series B exercise, with the balance of 134,054 shares being restricted[.]" Patriot National did not respond to the March 28, 2016 email by Hudson Bay.

67.    On March 30, 2016, CVI similarly sent an email to Patriot National with its calculation of the number of shares due and owing to it, indicating that it was owed 2,200,124 shares under the Series B Warrants.

68.    On April 5, 2016, Hudson Bay and CVI submitted exercise notices to Patriot National for the delivery of their shares under the New Series B Warrant (the "First Series B Exercise Notices").

69.     On April 8, 2016, Hudson Bay submitted a second Exercise Notice pursuant to the New Series B Warrant, this time for the delivery of 356,004 Shares (the "Second Series B Exercise Notice," and together with the First Series B Exercise Notices, the "Series B Exercise Notices").

70.     On April 8, 2016, Hudson Bay paid the exercise price for all the Shares subject to the Series B Exercise Notices.

**Defendants' Repudiation and Breach of the New Series B Warrants**

71.     The same day that Hudson Bay delivered its First Series B Exercise Notice, counsel for Patriot National sent a letter to Hudson Bay stating that Patriot National "will not honor" the notices.

72.     CVI went through a similar process with Patriot National and Mariano.

73.     The parties are now in litigation, and to date neither Patriot National nor Mariano has provided the requisite number of shares owned under the Securities Purchase Agreement and the accompanying warrants.

**The Stock Repurchase is a Manipulative Device**

74.     The Stock Repurchase Program, pursuant to which the Company repurchased over 1,300,000 shares, during a period in which the number of shares under the New Warrants to be given to the Private Equity Investors was measured, was a manipulative device that was intended to and did inflate the price of the Company's stock.

75.     It was also part of an effort by Mariano to cash in some of his shares, through the effective sale of his shares to Patriot National (which in turn was supposed to provide those shares to the Private Equity Investors), while limiting the amount of dilution of his percentage holdings and thus maintaining his control position.

76. Mariano's and the Company's manipulative conduct has resulted in suits against the Company, among other things, and the Company now owing to the Private Equity Investors millions of shares of stock.

**Materially False and Misleading
Statements Issued During the Class Period**

77. As discussed above, on March 3, 2016, the Company announced the Stock Repurchase Program.

78. The release failed to disclose that: (1) the repurchase was unnecessary; (2) it was entirely timed and motivated to artificially inflate the price of the Company's shares so that Mariano would not have to provide shares he did not have under the Securities Purchase Agreement and accompanying agreements; and (3) that the Company intended to make a significant amount of the repurchases immediately to coincide with the "measuring period" for the Class B Warrants, and not to make strategically timed purchases over an eighteen month period as represented.

79. As a consequence of the announcement of the Stock Repurchase Program, the Company's stock price started to rise on volume of over 1,000,000 shares (well over the Company's average volume), and remained inflated.

**Disclosures at the End of the Class Period**

80. On November 14, 2016, the Company disclosed the truth.

81. On that date, the Company announced that it was expanding the Stock Repurchase Program from $15 million to $40 million.

82. With this change in the Stock Repurchase Program, the Company characterized the repurchase increase (along with a special dividend) as a reward to shareholders for their patience.

83.     The Company had already, via the Stock Repurchase Program, driven the stock price up from $3.65 on March 2, 2016 to a high of $9.73 on August 11, 2016.  The absurdity of the March 3 2016 explanation was now made obvious to investors.

84.     Investors now saw the exposed truth – the Stock Repurchase Program was not about the Company's concern that the stock was significantly undervalued. As discussed above, the true purpose of the Stock Repurchase Program was to manipulate and artificially increase the price of the Company's stock, in order to decrease the number of shares that Mariano would be required to deliver to the Private Equity Investors and to enable Mariano to maintain his position as controlling shareholder and thus to entrench himself while cashing out some of these shares

85.     Moreover, on November 14, 2016, the Company announced negative third quarter earnings of $.06 per share.  As was made apparent in the Form 10-Q for the Third Quarter (filed on Nov. 14, 2016), no new repurchases had been made during the third quarter 2016.[1]  As a result, the earnings per share results were no longer being artificially manipulated by the Stock Repurchase Program.

86.     Upon these revelations, the stock price dropped nearly 10% on very high volume and continued to trade on very high volume for two more days, closing on November 16 over 12% lower than the stock price prior to the announcement.

---

[1] The Form 10-Q for the Second Quarter 2016 (filed on Aug. 15, 2016), announced that total purchases under the Stock Repurchase Program as of June 30, 2016 were 1,360,457 shares for a purchase price of $8.7 million in the open market. The Form 10-Q for the Third Quarter 2016 (filed on Nov. 14, 2016) announced that total purchases under the Stock Repurchase Program as of September 30, 2016 were still 1,360,457 shares for a purchase price of $8.7 million in the open market.  Therefore, no new purchases were made under the Stock Repurchase Program in the Third Quarter 2016.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Patriot National's common stock between March 3, 2016, and November 14, 2016, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of Mariano's immediate family and his legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

88.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Patriot National's common stock actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Patriot National shares were traded publicly during the Class Period on the NYSE.  As of November 14, 2016, Patriot National had 26,856,799 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Patriot National or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

89.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

90.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

91.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein, including whether the Stock Repurchase Program constitutes a manipulative device under the federal securities laws;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Patriot National; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

92.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

<u>**UNDISCLOSED ADVERSE FACTS**</u>

93.     The market for Patriot National's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, market manipulation and/or failures to disclose, Patriot National's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Patriot National's securities relying upon the integrity of the market price of the

Company's securities and market information relating to Patriot National, and have been damaged thereby.

94.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Patriot National's securities, through direct manipulation by way of the Stock Repurchase Program, and by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Patriot National's business, operations, and prospects as alleged herein.

95.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class, as was the Stock Repurchase Program.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Patriot National's financial well-being and prospects and directly manipulated the price of the Company's stock through the Stock Repurchase Program.  These material misstatements and/or omissions caused and manipulative device had the effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, and drove up the price of its stock thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and direct manipulation during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

96.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

97.     During the Class Period, Plaintiff and the Class purchased Patriot National's securities at artificially inflated or manipulated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the manipulation ceased causing investors' losses.

## SCIENTER ALLEGATIONS

98.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Mariano in particular knew that the Stock Repurchase Program was merely a device to increase the price of the Company's stock during the Class B Warrant measuring period, to alleviate his having to provide shares to the Company that he had encumbered.

99.      As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Patriot National, their control over, and/or receipt and/or modification of Patriot National's allegedly materially misleading misstatements and/or Mariano's association with the Company which made him privy to confidential proprietary information concerning Patriot National, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

100.    The market for Patriot National's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, and market manipulation, Patriot National's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Patriot National's securities and market information relating to Patriot National, and have been damaged thereby.

101.    During the Class Period, the artificial inflation of Patriot National's stock was caused by the material misrepresentations and/or omissions, and/or stock manipulation particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Patriot National's business, prospects, and operations, the Stock Repurchase Program and/or directly manipulated the market for its shares.   These material misstatements and/or omissions created an unrealistically positive assessment of Patriot National and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and/or directly drove up its stock price, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period and/or the Stock Repurchase Program resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

102.   At all relevant times, the market for Patriot National's securities was an efficient market for the following reasons, among others:

(a)   Patriot National stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Patriot National filed periodic public reports with the SEC and/or the NYSE;

(c)   Patriot National regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Patriot National was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

103.   As a result of the foregoing, the market for Patriot National's securities promptly assimilated current information regarding Patriot National from all publicly available sources and reflected such information in Patriot National's stock price. Under these circumstances, all purchasers of Patriot National's securities during the Class Period suffered similar injury through their purchase of Patriot National's securities at artificially inflated prices and a presumption of reliance applies.

104.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Patriot National of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial

25

prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

105.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Patriot National who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against Both Defendants

106.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) cause Plaintiff and other members of the Class to purchase Patriot National's securities at artificially inflated prices; and (iii) manipulate the market for Patriot National stock.

108.     In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

109.     Defendants (i) employed manipulative and deceptive devices in connection with the purchases and sales of Patriot National securities; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Patriot National's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

110.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Patriot National's financial well-being and prospects, as specified herein.

111.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Patriot National's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Patriot National and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

112.    Mariano was a high-level executive and director, as well as a controlling shareholder at the Company during the Class Period and had access to all internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and was aware of the Company's dissemination of information to the investing public and orchestrated the Stock Repurchase for his own benefit.

113.    Defendants' actions including making material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Patriot National's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.   Defendants had actual knowledge of the misrepresentations and/or omissions alleged and the Stock Repurchase would were false and would artificially inflate the price of the Company's shares.

114.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts or direct manipulation, as set forth above, the market price of Patriot National's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Patriot National's securities during the Class Period at artificially high prices and were damaged thereby.

115.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Defendants were experiencing and the true purpose of the Stock Repurchase Program, facts which were not disclosed by Defendants, and the manipulation of its price per share, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Patriot National securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

116.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

117.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against Mariano

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     Mariano acted as controlling persons of Patriot National within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position and ownership of over 50% of the Company's shares, and his awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Mariano had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading and the making of the Stock Repurchase program.  Mariano was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, Mariano had direct and supervisory involvement in the day-to-day operations of the Company and control over the Board, and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     As set forth above, Patriot National and Mariano each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, Mariano is liable pursuant to Section 20(a) of the Exchange Act. As a direct

and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  September 20, 2017                    Respectfully submitted,

                                        **SAFIRSTEIN METCALF LLP**

                              By:   s/ *Peter Safirstein*
                                        Peter Safirstein

                                        Elizabeth Metcalf
                                        1250 Broadway, 27th Fl.
                                        New York, NY 10001
                                        T/212-201-2845
                                        F/212-201-2858
                                        Email: psafirstein@safirsteinmetcalf.com
                                                emetcalf@safirsteinmetcalf.com

Lynda J. Grant
**TheGrantLawFirm, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
T/212-292-4441
F/212-292-4442
E/lgrant@grantfirm.com

*Attorneys for Plaintiff Adam Kayce
and the [Proposed] Class*

**SWORN CERTIFICATION OF PLAINTIFF**

**PATRIOT NATIONAL, INC. SECURITIES LITIGATION**

I, Adam Kayce, certify that:

1.      I have reviewed the Complaint and authorize its filing and the filing of a Lead Plaintiff motion on my behalf.

2.      I did not purchase the shares of Patriot National, Inc., at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on be on behalf of the class and will testify at deposition and trial, if necessary.

4.      My transactions in Patriot National during the Class Period set forth in the Complaint is a purchase of 373 shares on March 4, 2016.

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payments for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approve by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Date: 9|18|17

Adam Kayce